**\*FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

The Honorable Freda L. Wolfson, U.S.D.J.

| | | |
|---|---|---|
| JAMES COEFIELD, | : | Civil Action No. 06-512 |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| JERSEY CENTRAL POWER & LIGHT | | |
| CO., et al., | : | |
| | | |
| Defendants. | : | |

For Plaintiff:
Robert L. Tarver, Jr., Esq.
Law Offices of Robert L. Tarver, Jr.
66 South Main Street
Toms River, New Jersey 08757

For Defendants:
Sharon P. Margello, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart PC
10 Madison Avenue
Morristown, New Jersey 07960

WOLFSON, District Judge:

Presently before the Court is a Motion for Summary Judgment filed by Defendants Jersey Central Power & Light Co.("JCP&L), FirstEnergy Corp., Dennis McGuinness and Robert Brandeberry (collectively, "Defendants").[1] Plaintiff James Coefield ("Plaintiff") filed the instant action against Defendants for allegedly denying him overtime work by reason of his race, disability, and in retaliation for having previously filed a lawsuit against JCP&L and Mr. McGuinness for race discrimination.[2]  In addition, Plaintiff alleges that as a result of Defendants' discriminatory conduct, he suffered emotional distress.  The six-count Complaint alleges the following causes of action, all of which arise from New Jersey state statutory and common law: (I) violations of the New Jersey Against Discrimination ("NJLAD") for racial discrimination; (ii)  violations of the NJLAD for retaliation; (iii) violations of NJLAD for disability discrimination; (iv) violations of NJLAD against individual defendants for aiding and abetting the alleged acts of discrimination; (v) violations of future contract between JCP&L and Plaintiff, wherein JCP&L promises to enforce its policies, practices and handbooks that there be a hostility free work environment, free from racial and other harassment; and (vi) intentional infliction of emotional distress (collectively, "State Law Claims").  As the State Law Claims were removed to Federal Court based upon Defendants' assertion of federal preemption of all

---

[1] The Complaint also names John and Jane Does (1-10), supervisors, employees, agents, heirs, assigns and managers of Jersey Central Power and Light Co. and/or First Energy, who participated in any decisions concerning the employment actions regarding Plaintiff James Coefield.

[2] Plaintiff's previous lawsuit resulted in a dismissal in the district court, which was affirmed by the Third Circuit in Coefield v. GPU, 125 Fed. Appx. 445 (3d Cir. 2005).

Plaintiff's claims pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, this Court's initial legal determination turns on this precise issue. The Court holds that based on the undisputed facts in the record, Plaintiff's State Law Claims are not preempted by the LMRA and, thus, summary judgment is **DENIED**; and the State Law Claims are **REMANDED** to New Jersey Superior Court for further proceedings.

## BACKGROUND

For the purposes of this Opinion, the Court will only recount relevant facts. Plaintiff, an African American male, has been employed by JCP&L for over 27 years.[3]  Compl. at ¶ 7. He has received several promotions throughout his employment, and has been a union member during his entire tenure with JCP&L.  Defendants' Statement of Undisputed Material Facts ("Defendants' Statement") at ¶ 5; Plaintiff's Statement of Undisputed Facts ("Plaintiff's Statement") at ¶ 5.  Plaintiff currently works as a Senior Relay Technician in the Relay Department.  Id.  Including Plaintiff, there are nine senior relay technicians. Defendants' Statement at ¶ 8.  Defendant Mr. Guinness is a Supervisor in JCP&L's Relay Department.  Id. at ¶ 6.  In this position, McGuinness reports directly to defendant Brandeberry, who is the Manager of Substation Services for JCP&L.  Id.

The Relay Department is responsible for installing, checking and repairing electrical relays, and is primarily staffed by relay technicians who carry out these tasks.[4]  Id. at ¶ 3. Within the Relay Department, relay technicians are divided into three groups: junior relay technicians, relay technicians, and senior relay technicians.  Id. at ¶ 9.  Senior relay

---

[3]Defendant FirstEngery is a holding company which owns JCP&L.

[4]Relays are electrical/mechanical devices, which sense electrical conditions and trip circuit breakers if, for example, an electrical line has too much current or voltage.

technicians perform similar tasks to their more junior counterparts, but are required to take on more responsibility. Id. at ¶ 13. In particular, senior relay technicians are sent to various locations to test relays; they use "test sets" which are carried from their trucks to the site. Id. at ¶ 14. There is a dispute as to the weight of the test sets, but the parties agree that these sets generally weigh more than thirty pounds. See Id. at ¶ 15; see Plaintiff's Statement at ¶ 15. The technicians are also expected to climb in the course of carrying out their duties. Id.

In September 2004, Plaintiff underwent surgery and was absent from work due to a leak that was allowing cerebrospinal fluid to enter his nasal passage. Defendants' Statement at ¶ 17. Plaintiff's doctor informed JCP&L that Plaintiff would need to be out of work for at least six weeks to recover from the surgery and be on restricted duty for six weeks upon returning to work. Id. at ¶ 20; see Medical Status Report Form 709 dated 10/6/04; see also Plaintiff's Statement at ¶ 20. On October 18, 2004, Plaintiff's doctor sent a fax to JCPL&L advising that Plaintiff was cleared to work with a restriction that he could not lift more than twenty pounds and could not climb. See Dr. Palmer Fax 10/18/04; see Defendant's Statement at ¶ 21. Plaintiff did not return to work on October 18, 2004; instead Plaintiff's doctor completed a form stating that he would not be returning to work for another month. Defendant's Statement at ¶ 22; see Dr. Palmer Note 10/20/04. Shortly after this, on November 4, 2007, Plaintiff's doctor returned a completed form to JCP&L showing that Plaintiff was cleared to return for light work but could not lift more than twenty pounds for the next one to two months, and again, with the restriction of no climbing. Faxed Form 709 dated 11/3/04; Defendants' Statement at ¶ 23; Plaintiff's Statement at ¶ 23.

On November 8, 2004, after Plaintiff had not shown up for work, JCP&L requested confirmation regarding Plaintiff's work status.  Pursuant to this request, on November 10, 2004, JCP&L received a fax from Plaintiff with a doctor's note stating that Plaintiff had a swollen optic nerve and would not be returning to work on November 11, 2004.  See Fax from Coefield to Cooke 11/10/04; Plaintiff's Statement at ¶ 26.  Plaintiff's doctor also noted that Plaintiff would be out for work for two more weeks while he investigated Plaintiff's new malady.  Id.  Again, Plaintiff's doctor filled out a form, effective November 23, 2004, which stated that Plaintiff could return to work on modified duty and that he could not lift more than twenty pounds, had certain physical restrictions, and that his medications would impair his mental physical functions at work.  See Form 709 effective 11/23/04; see also Defendants' Statement at ¶ 28.  On November 25, 2004, Plaintiff sent JCP&L a form completed by his doctor indicating that Plaintiff could return to work on December 6, 2004, but was restricted to light duty with no lifting over twenty pounds, limitations on the amount of time he could stand/walk, sit and drive, and a notation that his medications will impair his functions at work.  He was to be on restricted duty for six months.  See Fax from Coefield 11/25/04; see Plaintiff's Statement at ¶ 29.

Plaintiff resumed his employment on December 6, 2004.  However, the next day, on December 7, 2004, Plaintiff went out on strike with his union.  The strike lasted until March of 2005.  Defendants' Statement at ¶ 31.  Upon his return to work, JCP&L accommodated Plaintiff's restriction by complying with the doctor's note, and did not request Plaintiff to perform any climbing or lifting beyond five to ten pounds.[5]  Id. at ¶ 32; see Plaintiff

---

[5]Defendants submit that they accommodated Plaintiff's restriction that he not lift anything more than five to ten pounds.  However, Plaintiff denies that his restriction

Statement at ¶ 32. In April 2005, JCP&L received another form completed by Plaintiff's doctor indicating that Plaintiff would be able to return to full duty with no restrictions on May 31, 2005.  See Form 709 dated 4/6/05; Defendants' Statement at ¶ 33.  The doctor clarified his recommendation, on June, 14, 2005, by faxing a notation to JCP&L that Plaintiff would continue to require a lifting restriction, as well as the assistance of another worker when lifting thirty to fifty pounds.  See June 14, 2005 fax from Dr. Palmer.   In addition, in June 2005, Plaintiff gave Mr. Brandeberry and Mr. McGuinness a 709 Form, completed by his physician following an evaluation on 6/1/05, that stated he could return to work with modified activity, working only 6-8 hours, that he could not climb, that he could not lift over thirty pounds maximum with frequent carrying of objects weighing no more than twenty pounds, and that he could only occasionally bend, twist, squat, and etc. See 709 Form dated 6/1/05; Defendants' Statement at ¶ 36; Plaintiff's Statement at ¶ 36.

On June 13, 2005, Mr. Brandeberry allegedly informed Plaintiff that the form submitted by his doctor was not clear with respect to his restriction status, since different boxes were checked, and thus, Plaintiff was to be considered on "light duty, restricted duty." Defendants' Statement at ¶ 37; Plaintiff's Statement at ¶ 37.  As a result of Plaintiff's restricted work status, Mr. Brandeberry informed Plaintiff that he could not work overtime. See Defendants' Statement at ¶ 38. On July 1, 2005, JCP&L received a revised Form 709, on which Plaintiff's doctor checked off the box "full activity," but crossed out the definition of (no limitations) and stated that Plaintiff continued to have a thirty pound lifting

---

was five to ten pounds as his doctor's note reflected a twenty-pound limitation.  See Fax from Coefield 11/25/04.

restriction unless lifting with a partner.  See 709 Form dated June 2, 2005.[6]  Plaintiff's physician also submitted a letter explicitly stating and explaining those restrictions. See Dr. Palmer's Letter dated 6/30/05.  Allegedly due to Plaintiff's restrictions, Defendants continued to deny Plaintiff the opportunity for overtime work despite his requests.

Consequently, on June 16, 2005, Plaintiff filed a grievance against JCP&L for violation of the Collective Bargaining Agreement (the "CBA") based upon JCP&L denying Plaintiff overtime while he was placed on restriction by his doctor.  See Grievance Form dated July 6, 2005.  Defendants contend that Plaintiff was denied overtime work due to his lifting restrictions.  Specifically, Plaintiff cannot participate in the single person team for overtime because he needs assistance lifting and carrying his test set, which, Defendants maintain, was consistent with their policy of permitting employees to work overtime only in single person teams.  Defendants' Statement at ¶ 55.  However, JCP&L's implementation and existence of its overtime policy is disputed.  See, generally, Plaintiff's Statement at ¶¶ 45-55; Defendant's Statement at ¶¶ 45-55.  The Court shall discuss JCP&L's overtime policy more fully later in this Opinion.

After filing several grievances, which are still pending, Plaintiff filed his six-count Complaint in New Jersey Superior Court on December 20, 2005, asserting the State Law Claims.  Defendants removed the case to this Court on February 2, 2006, alleging that all of Plaintiff's claims require interpretation of the CBA between Plaintiff's Union and JCP&L and, thus, the claims are preempted by the LMRA, 29 U.S.C. § 185, giving rise to this

----

[6]Plaintiff disputes that lifting with a partner is a limitation due to the fact that JCP&L has an established practice of allowing two or more people to lift heavier items. However, the Court does note that the limitations were set forth by his doctor, not by Defendants.

Court's jurisdiction to adjudicate the instant dispute.

## DISCUSSION

### I.    *Summary Judgment Standard*

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002)(citations omitted).

## II.   *Federal Preemption Under the LMRA*

Section 301 of the LMRA has been held to possess preemptive force so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim."  See Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987). It provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985), the Supreme Court set forth the standard for determining whether a state law claim is completely preempted by § 301: "When resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." Id. at 220 (citation omitted). In that case, the plaintiff brought a state tort claim against his employer for the bad-faith processing of an insurance claim. The Supreme Court concluded that this cause of action was completely preempted by § 301 because "the duties imposed and rights established through the state tort ... derive from the rights and obligations established by the [collective-bargaining] contract," and resolution of the dispute would therefore "inevitably ... involve contract interpretation." Id. at 217-18. The Supreme Court noted, however, that "it would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Id. at 212.

Subsequently, in Caterpillar Inc. v. Williams, 482 U.S. 386 (1987), the Supreme Court considered whether § 301 permitted employees covered by a collective bargaining agreement to bring state law contract claims for breach of individual contracts between an employee and his/her employer. After reiterating that § 301 "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement," the Supreme Court concluded that employees' state claims for breach of their individual employment contracts are not preempted. Id. at 394 (internal quotation omitted). The Supreme Court reasoned:

> Section 301 says nothing about the content or validity of individual employment contracts. It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under § 301. As masters of the complaint, however, they chose not to do so.
>
> Moreover, … respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement. It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.

Id. at 394-95.  The Third Circuit has interpreted Caterpillar as standing for the proposition that "employees have the option of vindicating their interests by means of either a section 301 action or an action brought under state law, as long as the state-law action as pleaded does not require interpretation of the collective bargaining agreement." Voilas, 170 F.3d at 373-74 (citing Caterpillar, 482 U.S. at 394-95).

The Supreme Court next addressed § 301 in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988), where it considered whether § 301 completely preempted an employee's state law retaliatory discharge claim against her employer. The Supreme Court's analysis focused first upon the elements necessary to make a prima facie retaliatory

-10-

discharge claim under the relevant state law: (1) discharge or a threat of discharge, and (2) a motive to deter the employee from exercising her rights. These elements, the court noted, constituted "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer," neither of which "required a court to interpret any term of a collective-bargaining agreement." Id. at 407.  Accordingly, the Supreme Court concluded that the employee's state claim was "independent" of the relevant collective-bargaining agreement for purposes of § 301 because "resolution of the state-law claim did not require construing the collective bargaining agreement." Id.

Morever, the Supreme Court found it irrelevant that "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether [the employee] was fired for just cause [under her collective-bargaining agreement]." Id. at 408. "Such parallelism," according to the Supreme Court, would not "render[] the state-law analysis dependent upon the contractual analysis." The Supreme Court opined that the reason for this is that

> § 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of [collective-bargaining] agreements. In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 preemption purposes.

Id. at 409-410.

The Supreme Court also addressed § 301 preemption in Livadas v. Bradshaw, 512 U.S. 107 (1994).  There, the Supreme Court was required to consider whether § 301

preempted a plaintiff's state law claim to recover a statutory penalty arising from her former employer's payment of late wages. The Supreme Court began its analysis by summarizing the relevant controlling principles:

> The pre-emption rule has been applied only to assure that the purposes animating § 301 will be frustrated neither by state laws purporting to determine "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement," nor by parties' efforts to renege on their arbitration promises by "relabeling" as tort suits actions simply alleging breaches of duties assumed in collective-bargaining agreements ....

> In [Allis-Chalmers] and in Lingle ..., we underscored the point that § 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law, and we stressed that it is the legal character of a claim, as "independent" of rights under the collective-bargaining agreement (and not whether a grievance arising from "precisely the same set of facts" could be pursued) that decides whether a state cause of action may go forward. Finally, we were clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.

Id. at 122-24 (internal citations and footnotes omitted). Applying these principles, the Supreme Court reasoned that the

> only issue raised by [the plaintiff's] claim, whether [her employer] "willfully failed to pay" her wages promptly upon severance, was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer. There is no indication that there was a "dispute" in this case over the amount of the penalty to which [the plaintiff] would be entitled, and Lingle makes plain in so many words that when liability is governed by independent state law, the mere need to "look to" the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301.

Id. at 124-25. Accordingly, the Supreme Court concluded that the plaintiff's state law claim was not completely preempted by § 301 of the LMRA.

-12-

The Third Circuit has previously had occasion to review extensively the Supreme Court's jurisprudence regarding the complete preemption of state law claims under § 301 of the LMRA. See, e.g., Voilas v. General Motors Corp., 170 F.3d 367, 373-76 (3d Cir. 1999); Trans Penn Wax Corp. v. McCandless, 50 F.3d 217, 228-30 (3d Cir. 1995); Berda v. CBS, Inc., 881 F.2d 20, 22-25 (3d Cir. 1989); Kline v. Sec. Guards, Inc., 386 F.3d 246, 251-54 (3d Cir. 2004). Based on those enumerated principles set forth by the Supreme Court, the Third Circuit has explained that "[o]nly state law claims 'inextricably intertwined with considerations of the terms of the labor contract' are preempted by [LMRA]." Malia v. RCA Corp., 794 F.2d 909, 912 (3d Cir. 1986); see also Carrington v. RCA Global Communications, Inc., 762 F. Supp. 632, 640 (D.N.J. 1991).

Guided by the Circuit's interpretation, various district courts in New Jersey have held that claims under the New Jersey Law Against Discrimination (NJLAD) are separate and independent from the terms of labor contracts. See, e.g., Naples v. New Jersey Sports and Exposition Authority, 102 F.Supp 2d. 550, 553 (D.N.J. 2000) (because state claims can be resolved without interpreting the CBA, the claims are not preempted by the LMRA); Mitchell v. Village Super Market, Inc., 926 F. Supp. 476, 479-81 (D.N.J. 1996). For instance, in Carrington, the court exhaustively reviewed the pertinent case law and determined that the LMRA did not preempt NJLAD racial discrimination claims. See Carrington, 762 F. Supp. at 640-42. In that case, the court held that "both the existence and the scope of plaintiff's state law discrimination claims under NJLAD are derived independently from state law, and not from the obligations assumed by the parties under the labor agreement." Id. at 641; see also Mitchell, 926 F. Supp. at 480 ("The right not to be discriminated against is defined and enforced under state law without reference to the

terms of any collective bargaining agreement even where the labor contract itself prohibits discrimination" (internal quotations omitted)).

In <u>Kube v. New Penn Motor Express, Inc.</u>, 865 F.Supp. 221 (D.N.J. 1996), the court held that LMRA did not preempt a NJLAD disability discrimination claim. Similar to <u>Carrington</u>, the court found that the adjudication of plaintiff's disability discrimination claim did not require the interpretation of the pertinent collective bargaining agreement. The court reasoned:

> the New Jersey Supreme Court, relying on the New Jersey Administrative Code, has determined that an employer's decision to terminate a handicapped employee because of his handicap requires "an objective standard supported by factual or scientifically validated evidence, rather than . . . general assumptions that a particular handicap would create a hazard" to the employee or to others. . . . Consequently, the outcome of plaintiff's discrimination claim will depend on the actual events which transpired between plaintiff and defendant, and not on the meaning of any provision of the collective bargaining agreement.

<u>Id.</u> at 228-29 (quoting <u>Jansen v. Food Circus Supermarkets, Inc.</u>, 110 N.J. 363 at 378). Ultimately, the <u>Kube</u> court reasoned that because the plaintiff has to prove his <u>prima facie</u> case of discriminatory discharge according to the factors set forth by case law, it is not necessary to interpret the collective bargaining agreement.

On the other hand, decisions that have found preemption of state law discrimination claims have been in cases where the CBA specifically governed the litigated cases. For example, in <u>Reece v. Houston Lighting & Power Co.</u>, 79 F.3d 485 (5th Cir.), <u>cert. denied</u>, 519 U.S. 864 (1996), the plaintiff's discrimination claim actually "turned on questions of promotion, seniority, and assignment to training programs, all of which are provided for in the CBA." <u>Id.</u> at 487. The Fifth Circuit observed that the plaintiff would have to challenge the employer's rights under the CBA and that therefore, the interpretation of the

-14-

CBA was "made necessary by an employer defense."  Id. (citations omitted).  Because the litigated issues were specifically covered in the CBA, the Circuit upheld the trial court's determination that plaintiff's state law discrimination claims were preempted by the LMRA. See, e.g., O'Brien v. Consolidated Rail Corp., 972 F.2d 1 (1st Cir. 1992), cert. denied, 506 U.S. 1054 (1993) (state discrimination claim was preempted by the LMRA because seniority was among the litigated issues and was also covered in the CBA, which contained explicit rules and regulations governing an employee's fitness and ability to perform safely the functions of a stevedore); Davis v. Johnson Controls, Inc., 21 F.3d 866 (8th Cir.), cert. denied, 513 U.S. 964 (1994).  Indeed, as evidenced by these cases, disputes "relating to qualifications and seniority usually require recourse to details that are embedded in CBAs." Fant v. New England Power Serv. Co., 239 F.3d 8, 15 (1st 2001)(emphasis added).  With this background, the Court now turns to each of Plaintiff's claims to determine whether they require interpretation of the CBA.

### A.    *Count I - Racial Discrimination Pursuant to NJLAD*

To establish a prima facie case of racial discrimination under NJLAD, a plaintiff must show that: (1) he was a member of a protected group; (2) he was qualified for the position sought; (3) he was denied the promotion; and (4) others with similar or lesser qualifications achieved the promotion.[7] Dixon v. Rutgers, 110 N.J. 432, 443 (1988).  Here, it is undisputed that the CBA is unrelated to the first element as there is no dispute that Plaintiff is an African American male.  However, with respect to the other elements,  Defendants'

---

[7]The Court is reviewing the elements of a prima facie case to resolve the preemption issue only, and thus, the Court will neither discuss nor review the merits of the claims.

submissions in support of their motion do not explicitly address how they relate specifically to the CBA. Presumably, the second, third, and fourth elements would relate to Defendants' contention that the CBA delegated certain exclusive rights to the employer to establish the eligibility for overtime assignments. In other words, the litigated issue here is the determination of which employees are qualified to work overtime. Upon examination of the elements, the Court finds Plaintiff's racial discrimination claim does not require interpretation of the CBA.

Initially, it is important to determine the nature of Plaintiff's allegations of Defendants' misconduct. Plaintiff alleges in his Complaint that because he is one of the top three performers each year as relates to overtime work performance, he has been granted many opportunities to work overtime. Plaintiff's Comp. at. ¶ 20. In fact, Plaintiff alleges that he was scheduled for and did perform overtime work as late as June 11, 2005, during the period of time when Plaintiff was considered by Defendants to be on restricted status as. Id. at ¶ 21. Plaintiff further alleges that Mr. McGuinness and Mr. Brandeberry determined that Plaintiff could not work overtime on June 13, 2005, or thereafter, due to his medical restriction, while Caucasian employees who were under restrictive limitations, which affected or may have affected these employees' abilities to perform the essential functions of their jobs, were permitted to work overtime. Id. at ¶¶ 22, 26. Simply put, Plaintiff's allegations essentially assert that Defendants discriminatorily implemented their overtime policy based upon race and disability.

Nonetheless, Defendants contend that the CBA in question provides Defendants the exclusive right to establish which employees are "qualified" to be eligible for overtime work and pay. Defendants concede that JCP&L has, by policy and practice, excluded employees

on restricted or light duty from working overtime.  Defendants' Statements at ¶ 46.  In addition, JCP&L has a policy that employees working overtime will be sent out in single person teams.  Id. at ¶ 55.  In other words, Defendants, by practice, have defined which employee is "qualified" within the context of the CBA's overtime provisions.   Therefore, Defendants argue that since the provisions of the CBA are implicated, the LMRA preempts all of Plaintiff's State Law Claims, including the racial discrimination claim.  However, given the nature of Plaintiff's NJLAD claims as it relates to the CBA, Defendants' preemption argument fails as a matter of law.

Pursuant to Article V of the CBA, entitled "Hours of Labor - Holidays - Overtime," "[o]vertime work shall be equitably distributed by [JCP&L] among qualified employees who are reporting at the location, insofar as is practicable.  The method of distribution is based on the number of overtime assignments."  CBA at ¶ 5.11(b).  Particularly, the CBA sets forth that "[f]or the purpose of having employees readily available for call-out overtime, as determined by [JCP&L], up to two (2), two-man 'on-call crews' may be established in each department and/or section.  Qualified employees will be given the first opportunity to volunteer for the on-call crew on a weekly basis."  Id. at ¶ 5.11(d).  Further, "[o]vertime shall be shared equally among qualified available employees in each classification of work, so far as is practicable."  Id. at ¶ 5.15(a).  However, the term "qualified" is neither explicitly nor implicitly defined anywhere in the CBA.   In fact, as stated by Defendants, JCP&L determines which employee is qualified pursuant to its own practice and policy.

While recognizing that fact, Defendants rely on Consolidated Rail Corp. v. Railway Labor Executives' Assoc., 491 U.S. 299 (1989), for the proposition that past policy and procedure is pertinent in interpreting a collective bargaining agreement.  In that case, the

Supreme Court held that, in the context of the Railway Labor Act, a collective bargaining agreement is to be interpreted in light of implied and express terms, the parties' practice, usage, and custom, and the common law applicable to that particular agreement. Id. at 311-12.  While the rationale of Consolidated Rail applies to how this Court should interpret a collective bargaining agreement in general, this rationale is misplaced in the present preemption context.  The Court's initial inquiry, here, is not how the CBA should be interpreted, rather, it is to make a determination whether the state law claims are inextricably intertwined with considerations of the terms of the labor contract.  In that regard, if any provision of the CBA was indeed utilized by Defendants to interpret the term "qualified" employees, then the LMRA would necessarily preempt Plaintiff's State Law Claims.  Such is not the case here.  See Swift Electrical Supply Co. v. Township of Lakewood, 168 F.Supp. 2d 298, 307 (D.N.J. 2001)(quoting Lingle, 486 U.S. at 413, n.12)("as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state-law analysis that does not turn on the agreement.  In such case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby preempted").

Rather, the Court finds that the policy that persons on modified or restricted duty cannot work in an overtime capacity has been solely determined by Defendants and not proscribed in the CBA.  This important distinction was thoroughly discussed in Patterson v. Exxon Mobil Corp., 262 F.Supp. 2d. 453 (D.N.J. 2003).  In Patterson, the district court found that despite defendants' claim that the "qualifications" for promotional advancement were in the collective bargaining agreement, they were not explained or listed.  The court also found that although there were references in the agreement, the agreement did not

supply a rule of decision.  Specifically, the court noted that "[t]he CBA indicates that 'awards to positions will be made on the basis of qualifications for the position[,]' . . . but nowhere explains or lists the qualifications for promotion." Id. at 459.  In fact, the court found that defendant Exxon Mobil had developed an extensive procedure to address which employees within the unit were best qualified to receive a promotion or job transfer to a more favorable position within that unit; the CBA neither set forth the "qualifications" necessary for a promotion, nor explained them.  Id.  As such, the court ultimately held that no reference to the agreement is needed to resolve plaintiff's allegations that he was denied a job transfer although he was the number one ranked employee.  Id. at 460.

Analogous to Patterson, the present case involves a similar clause in the CBA wherein the CBA notes that a "qualified" employee should be given overtime, but nowhere does the CBA explain or define what "qualified" means.  Indeed, despite Defendants' argument that the CBA provisions must be interpreted to determine the validity of Plaintiff's claims, Defendants concede that the determination of which employee is "qualified," is established through their practice and policy, and is not explicitly found in the CBA.  Thus, the overtime provisions of the CBA are merely consulted in the first instance to determine to what extent the CBA governs overtime.  Since Defendants failed to point to any other provision of the CBA that is instructive to the Court as to how the term "qualified" should be defined, and since Plaintiff's allegations involve discriminatory conduct by Defendants in implementing their policy and procedure, and Plaintiff does not challenge the validity of any provision of the CBA or dispute Defendants' rights and obligations under that agreement, the CBA does not need to be interpreted.  See Livadas, 512 U.S. at 123-26 ("[w]hen the meaning of contract terms is not subject to dispute, the bare

fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished").

Thus, resolution of Plaintiff's claims turns on the actual events that transpired between Plaintiff and Defendants (i.e., Defendants' overtime policy, how they allegedly implemented it, and their motivation in denying Plaintiff overtime work), rather than turning on any provision of the CBA. See Allis-Chalmers Corp., 471 U.S. at 212 ("it would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract"). As such, the Court holds that because state law necessarily protects Plaintiff's interests and rights in this instance, the LMRA does not preempt Plaintiff's NJLAD claim based on racial discrimination.[8]   See Smolarek v. Chrysler Corp., 879 F.2d 1326, 1334 (6th Cir.), cert. denied, 493 U.S. 992 (1989) (recognizing that a claim for discrimination involves purely factual questions concerning the employer's behavior and does not require interpretation of the collective bargaining agreement).

B.    *Count II - Retaliation Claim Pursuant to NJLAD*

In order for a plaintiff to state a prima facie case of retaliation under the NJLAD, he must establish the following factors:

---

[8]References to, or considerations of, the terms of a collective-bargaining agreement are not the equivalent of interpreting the meaning of the terms.  If they were, all discrimination actions brought by unionized employees would be preempted because the starting point for every case would have to be the agreement.  Although the line between reference to and interpretation of an agreement may be hazy, merely referring to an agreement does not threaten the goal that prompted preemption, which is the desire for uniform interpretation of labor contract terms.  See Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 749 (9th Cir. 1993).  With that in mind, Defendants may not frame Plaintiff's claims of discriminatory conduct in terms of preemption to escape potential liability.

1.      Plaintiff was engaged in protected activity known to defendant;
2.      Plaintiff was thereafter subjected to an adverse employment decision by the defendant; and
3.      There was a causal link between the two.

Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 548-49 (App. Div. 1995).  Plaintiff claims that he engaged in a protected activity by filing a prior lawsuit alleging race discrimination against Defendants, and that he was denied the opportunity to work overtime because of that prior law suit.[9]  With respect to the first element, the Court finds that Plaintiff did in fact allege a sufficient protected activity.  However, the second and third elements do not hinge upon whether or how the CBA was interpreted by Defendants in order to deny Plaintiff overtime work.  Therefore, for the reasons set forth above at length, the conduct of Defendants is at issue and the resolution of this claim does not turn on any provision of the CBA, and therefore, it is not preempted by the LMRA.  See, e.g., Lingle, 486 U.S. at 407 (finding that state law claim for retaliatory discharge involved purely factual questions).

C.      *Count III - Disability Discrimination Pursuant to NJLAD*

In order to establish a claim for disability discrimination, a plaintiff must show that (1) he was disabled within the meaning of the law; (2) he was meeting the employers' legitimate performance expectations; (3) suffered an adverse employment action; and (4) there is a causal connection between plaintiff's disability and the adverse employment action.  Mosely v. Femina Fashions, Inc., 356 N.J. Super. 118, 130-31 (App. Div. 2002).  Without determining whether Plaintiff's disability was within the meaning of the law, the

---

[9]Again, to the extent the Court discuss the elements of retaliation, that is done only for the purpose of reviewing preemption; the Court does not determine the merits of this claim.

Court finds that the second, third, and fourth elements correlate with Defendants' reasons for denying him the opportunity to work overtime.  Such reasoning relates to JCP&L's overtime policy and how JCP&L implemented its policy.  Thus, this state law claim is also not preempted by the LMRA.

          D.    *Counts IV, V and VI*

Collectively, Counts IV, V and VI are state law claims that are necessarily predicated upon the allegedly illegal conduct by Defendants.  Specifically, Count IV alleges that the individual defendants aided and abetted JCP&L in discriminating against Plaintiff based on his race, his disability, and in retaliation for filing a law suit; Count V alleges that due to the intentional discriminatory acts of Defendants, Plaintiff was emotionally harmed; and Count VI alleges that Defendants have violated some future contract with Plaintiff due to Defendants' discriminatory conducts.  Without setting forth the legal standard for each of the claims, the Court finds that because these claims are related to the alleged discriminatory conduct of Defendants, they are not preempted by the LMRA.  Indeed, they are independent state law claims that do not require any interpretation of the CBA.[10]

## III.   *Supplemental Jurisdiction*

Title 28 of the United States Code, Section 1367(c) states in relevant part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the

---

[10]Defendants further advance the argument that Plaintiff has filed several grievances against JCP&L based on being denied the opportunity to work overtime in violation of the CBA.  Defendants argue that under the terms of the CBA, Plaintiff must follow the CBA's three-step grievance procedure, and since Plaintiff has failed to exhaust his administrative remedies by pursuing the grievance procedures of the CBA, his claims should be dismissed.  However, as the Court has determined that the LMRA does not preempt Plaintiff's claims, the Court does not reach this issue here.  Therefore, Defendants can reassert the same argument in state court.

claim substantially predominates over the claim or claims over which the district court has original jurisdiction, [or] the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. §1367(c).   Moreover, absent some compelling circumstances, it is generally proper for the district court to decline to exercise supplemental jurisdiction. See Shaffer v. Albert Gallatin Area Sch. Dist., 730 F.2d 910, 912 (3d Cir. 1984)(holding that "pendant jurisdiction [over state law claims] should be declined where the federal claims are no longer viable . . . " (citation omitted)); see also Hedge v. Musco, 204 F.3d 109, 123 (3d Cir. 2000)(recognized that if the district court has dismissed all claims over which it has original jurisdiction, the court must decline to decide pendent state claims unless "considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so").

Furthermore, district courts should not decide issues of state law "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  If the state issues substantially predominate, then the state claims may be dismissed without prejudice and left for resolution to state tribunals.  Id.  Courts in this circuit have consistently declined to exercise supplemental jurisdiction over state claims when all federal claims have been decided.  See Hedge, 204 F.3d at 122-23 (upholding district court's refusal to exercise supplemental jurisdiction over state law assault and battery claims after dismissing plaintiff's § 1983 claims); V-Tech Serv., Inc. v. Street, 215 Fed. Appx. 93, 96 (3d Cir. 2007) (refusal to exercise supplemental jurisdiction over fraud, promissory estoppel, breach of contract, and unjust enrichment claims after dismissal of RICO claims); Wall v. Dauphin County, 167 Fed. Appx. 309, 313 (3d Cir. 2006) (dismissal of state claims for lack

of jurisdiction after dismissal of plaintiff's § 1983 and § 1985 claims); <u>Mosca v. Cole</u>, 384 F.Supp.2d 757, 770 (D.N.J. 2005) (remanding remaining state LAD and other claims back to state court after plaintiff's § 1981, § 1985 and other federal claims were dismissed by the district court).

Here, because the sole issue that brought the parties to this Court has been resolved, and the Court has determined that the LMRA does not have a preemptive effect on Plaintiff's State Law Claims, the Court is declining to exercise supplemental jurisdiction over Plaintiff's purely state law based claims.  As such, it is important to reiterate that the Court's legal analysis, herein, pertaining to federal preemption does not in any way comment upon or decide the merits of Plaintiff's claims; instead, all claims arising from Plaintiff's Complaint are remanded to New Jersey Superior Court for further proceedings.

Dated: December 10, 2007                    ___/s/ Freda L. Wolfson___
                                            **Freda L. Wolfson, U.S.D.J.**